# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

Respondent,

v.

DEON WILLIAM GLASS,

Appellant.

No. 86964-7-I

DIVISION ONE

UNPUBLISHED OPINION

BIRK, J. — A jury convicted Deon Glass of four counts of child molestation in the second degree for sexually abusing R.W.,[1] the daughter of his then-girlfriend now-wife, J.P. Glass appeals, arguing the State's opening and closing remarks, as well as trial theme, constituted misconduct by shifting the burden of proof and encouraging the jury to decide the case on emotion. He argues the State committed further misconduct in introducing evidence of R.W.'s disclosures to J.P. and a family friend, J.S., evidence purportedly barred by an order in limine. He also argues several of his community custody conditions are unconstitutional. As to one community custody condition, we reverse based on the trial court's failure to conduct a fact specific inquiry into how the condition limiting Glass's contact with his children would impact his fundamental right to parent. Otherwise, we affirm.

---

[1] Given the sensitive nature of the offense, we refer to the victim and family members by their initials rather than their names.

I

Glass began dating J.P. in 2014. R.W. lived with Glass and J.P. from 2014 to 2019. Glass and J.P. had two children together.

The State charged Glass with one count of child molestation in the second degree. Before beginning voir dire, the State sought arraignment on its amended information, which added three new counts of child molestation in the second degree. Glass pleaded not guilty to all counts.

A

Before trial and voir dire began, the parties disputed whether statements identifying Glass could come in under a hearsay exception. The State sought to admit four disclosures made by R.W. to J.P., J.S., and Officer Bergman under the fact of the complaint doctrine. The State indicated that, from J.S., it would be "seeking to elicit the details of the disclosure to [J.S.] through hearsay by way of explaining the triggering of law enforcement involvement in this case."

The State also sought to elicit from J.S. that R.W. told her Glass was sexually assaulting R.W. Glass indicated these statements would be appropriate to come in as prior inconsistent statements but objected to their inclusion during the State's case-in-chief as hearsay. The State noted it would not be seeking to elicit J.S.'s testimony about what R.W. said to her for the truth of the matter and instead would be offering it to show how law enforcement became involved.

The court noted Glass objected to the introduction of J.S.'s statements to identify Glass under the fact of the complaint doctrine. The court then concluded

it would exclude fact of the complaint evidence introducing Glass's identity. Addressing the State's request to introduce the statements to show how law enforcement became involved, the court stated, "That's fine. But you want her to go beyond that and say it was him. And I'm saying no."

B

During voir dire, the State asked potential jurors about what types of evidence they might expect to see in a child molestation case. The State asked juror 1, "[I]f there are photographs that can be used as evidence against the molester, who chooses to create that evidence?" The State also asked, "We talked about perhaps the expectation that there would be physical evidence to support a case like this. What else might you hear if you make the jury?" In discussing production of electronic evidence, the State asked juror 26, "In the context of an adult perpetrator, a child victim, again, who would you say is kind of more responsible for the possibility of that evidence being generated in that relationship?" The State then asked juror 18 if they would expect to see eyewitness testimony. The State asked juror 25, "[A]re there ways in which that kind of fostered relationship might impact the gathering of evidence in an eventual investigation?" After speaking with other jurors, the prosecutor noted that he "forgot to go back to [juror] 51 on a topic." When called on, juror 51 responded to the State's earlier question about evidence, stating,

> I think that there's a lot of evidence that—this is my—I should say that my daughter-in-law is a certified sexual assault investigator. Just in our family conversations and so forth, she has revealed a lot of information, not specifics about particular cases, of course. So

3

much of it is not physical evidence. There's a whole lot more goes on and has nothing do with what someone might—a scratch or a cut. Coercion, body language, a lot of those sorts of things that are really telling and can be from her experience and other experiences. So it's not just a picture or a scratch. A lot more to it than that.

After juror 51 gave this response, in summing up the prospective jurors' responses to the State's questions about evidence, the State said,

I think we have essentially settled that these types of crimes won't very often, I suppose, leave physical evidence, things like DNA, as opposed to an implicitly physically violent offense that involves exchange of body fluids like—I will call it a, quote, classic rape. These types of crimes stand different.

Now, after hearing this, I would like you to raise your hand if you still feel that you would not be able to convict somebody of child molestation without DNA evidence. They feel they would require DNA evidence to convict somebody of a crime like child molestation.

C

1

Glass's trial began on May 15, 2024. The State began its opening statement as follows:

The first time that [R.W.] cried to her mother for help, she took the abuser's side. The second time, almost a year later, that [R.W.] cried to her mother for help, her mother responded by packing up the family—[R.W.]'s siblings, step-siblings—and moving out, leaving 13-year-old [R.W.] behind.

This is a case about the damage that a mother's denial, or a mother in denial, can wreak upon a young woman. It's a case about how being labeled a liar by the one person arguably on this earth whose duty is to protect you most can paint or enlarge a target that already existed on your back, a target for the one person that [R.W.] was crying for protection from; the defendant, . . . Glass.

. . . .

You will hear testimony that all it took for her mother to choose the defendant, to take his side, was a simple denial. She has, on the

4

one hand, her 12-year-old daughter crying for help, and a simple denial from her boyfriend, the defendant. You will hear testimony from [R.W.] that in the presence of the defendant, she called her a liar. . . .

You will hear [R.W.] testify that after [a] short grace period, he continued—or recommenced regularly seeking her out in moments where she was alone and vulnerable and groping her breasts. It escalated. . . .

2

The State called four witnesses: R.W., J.S., Officer Bergman, and J.P.

R.W. testified that Glass sexually abused her more than 50 times over the course of a year and a half, beginning when she was 12. She testified she eventually told her mother, who called her a liar. When she told her mother, she said her mother brought her to talk with Glass and to tell him what she had told her mother. She testified she did not believe her mother believed her because after reporting it, her mother said that R.W. wanted to touch Glass. R.W. testified that after confronting Glass, the abuse paused for two weeks.

R.W. recounted a time soon after when J.S. asked her "if he was doing it." R.W. testified that "at the time I told her no because I didn't want her to do what my mom did and call me a liar. And then she told me if he does do it to text her." She reported she did not follow up on this offer to text J.S. because she was scared of what her mother did.

R.W. testified that after the family moved into her aunt's apartment, the abuse continued. She testified she told her cousin what was happening and that her cousin took her to see J.P. Her mother confronted Glass again, and then Glass left the apartment. She described how Glass later came back only to be kicked

out by R.W.'s aunt, J.P.'s sister. According to R.W., her mother did not say anything to her but moved Glass and their other children out to a friend's house, leaving R.W. at the apartment with her aunt and cousin.

After R.W. had lived with her aunt for two months, J.P. and J.S. agreed to have R.W. live with J.S. R.W. then told J.S. what had been happening. Since then, R.W. has not spoken to her mother regularly. R.W. testified J.P. told her that J.P. had been molested but R.W. did not remember the details of what happened to her mother.

J.S. testified that she and J.P. used to be best friends. J.S. testified J.P. reached out to her in 2018 to have a talk with R.W. because R.W. kept saying she was being touched. She testified she asked R.W. only the one time if she was being touched, and R.W. told her no. She testified J.P. kept saying she did not know what to believe in response to R.W.'s allegations.

J.S. recounted how after R.W. moved to her aunt's, she did not see R.W. in any photos of the family J.P. uploaded to Facebook. She described asking J.P. if R.W. could move in with her, and explained J.P. knew she was a mandated reporter. She testified that the night R.W. moved in with her, R.W. disclosed to her that Glass had been abusing her. J.S. then took R.W. to J.S.'s local police department to report it to law enforcement.

J.P. testified that R.W. told her twice that Glass was molesting her. She testified that when R.W. told her the first time, she told Glass, who denied molesting R.W., and that she believed him in that moment. J.P. said that after she

told Glass, she asked R.W. if she was sure. J.P. testified she just did not really know who to believe, and that R.W. acted like she did not want to do her chores.

The second time R.W. told J.P. Glass was molesting her, J.P. said R.W. was crying because R.W. did not want to do the dishes. J.P. added that when R.W. was eight or nine years old, she had told R.W. that as a kid, she had been molested. J.P. indicated what R.W. told her Glass was doing to her was the same as what had been done to J.P.

3

The jury instructions included a statement of the burden of proof: "The State is the plaintiff and has the burden of proving each element of each crime beyond a reasonable doubt. The defendant has no burden of proving that a reasonable doubt exists as to these elements."

The State began closing argument by saying, "The only thing really that [R.W.] needed was her mother's protection, for her mother to listen to her cries for help to make the defendant stop." The State argued,

> It makes sense that after this first disclosure to her mother where she is labeled a liar by the one person that is supposed to protect her that the defendant would be emboldened, that he would feel that he was able to act more freely, to have more egregious behavior. He knew that [J.P.] was not going to believe [R.W.] no matter what she said. Frankly, it bore out that way as well.

The State argued further,

> I don't think it's a stretch to argue that we can apply our common sense to the situation that [R.W.] faced and find it likely that after she tried to get the abuse to stop and was publicly labeled a liar in front of the abuser that the abuse would then escalate. . . . Then she's labeled a liar by, again, the one person on this earth that is supposed to protect her, in front of the guy who [R.W.]'s crying out is abusing

her. She may as well have thrown a bucket of chum on [R.W.] and thrown her into shark-infested waters.

In rebuttal closing argument, the State argued,

Let's talk about the, I guess, supposed memory or lack of detail issues that were raised in closing. I wager to say that those of you who are married or those of you who eventually get married will for the rest of your life remember the marriage. But the next day, you might not remember the gift that your great aunt got you off your registry. A year later you might not remember who was sitting at the table across from you. I mean, these are memory, I suppose, realities that every person walking around every single day in real life deals with. And there are plenty of reasons to have a lack of memory or lack of detail that don't add up to lying. Could be the trauma response. Could be the simple passage of time. Could be nerves. Could be any number of things.

Now, if these inconsistences or these memory realities I will call them, occur in our daily lives, how dare we expect the victim of a sexual abuse to come and testify on a higher standard than that. How dare we. Just by the fact that she is saying that she was horrifically abused for over a year? No.

The jury found Glass guilty on all four counts.

D

At the sentencing hearing, the court imposed a sentence of 116 months on each of the four counts concurrently, with four months of community custody, and imposed all community custody conditions proposed by the State.

Glass appeals.

II

Glass argues the State improperly suggested to the jury its burden of proof was lower than beyond a reasonable doubt during voir dire and closing arguments, improperly constructed a trial theme geared towards the jury's sympathies, and elicited impermissible testimony violating a ruling in limine. Glass argues these

instances cumulatively are "particularly prejudicial here, where the jury's decision essentially boiled down to credibility: did it believe R.W.'s testimony or did it harbor reasonable doubts about R.W.'s testimony." We disagree.

"The Sixth Amendment to the United States Constitution guarantees a defendant a fair trial but not a trial free from error." State v. Fisher, 165 Wn.2d 727, 746-47, 202 P.3d 937 (2009). Prosecutorial misconduct may deprive a defendant of their constitutional right to a fair trial. In re Det. of Glasmann, 175 Wn.2d 696, 703-04, 286 P.3d 673 (2012). "A defendant claiming prosecutorial misconduct has the burden to prove that the prosecutor's conduct was both improper and prejudicial." State v. Ritchie, 24 Wn. App. 2d 618, 638, 520 P.3d 1105 (2022). We examine whether the prosecutor's conduct was both improper and prejudicial in the context of the entire record and circumstances at trial. State v. Thorgerson, 172 Wn.2d 438, 442, 258 P.3d 43 (2011). " 'Once proved, prosecutorial misconduct is grounds for reversal where there is a substantial likelihood the improper conduct affected the jury.' " Ritchie, 24 Wn. App. 2d at 638 (quoting Fisher, 165 Wn.2d at 747).

" '[F]ailure to object to an improper remark constitutes a waiver of error unless the remark is so flagrant and ill intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury.' " Thorgerson, 172 Wn.2d at 443 (quoting State v. Russell, 125 Wn.2d 24, 86, 882 P.2d 747 (1994)). Under this heightened standard, the defendant must show that (1) no curative instruction would have obviated any prejudicial effect on

the jury and (2) the misconduct resulted in prejudice that had a substantial likelihood of affecting the jury verdict. State v. Emery, 174 Wn.2d 741, 761, 278 P.3d 653 (2012). The analysis " 'focus[es] less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured.' " State v. Loughbom, 196 Wn.2d 64, 74-75, 470 P.3d 499 (2020) (alterations in original) (quoting Emery, 174 Wn.2d at 762).

## A

Glass argues the State committed misconduct by exceeding the permissible scope of voir dire "by priming the jury to accept an absence of evidence as normal." Glass argues that the State's statements in voir dire suggested that he could be deemed responsible for the absence of other kinds of evidence when the only eyewitness evidence the State presented of what happened would be R.W.'s testimony.

In a criminal trial, "the State bears the burden of proving its case beyond a reasonable doubt, and the defendant bears no burden." Emery, 174 Wn.2d at 760. "[I]t is improper for the prosecutor to argue that the burden of proof rests with the defendant." Thorgerson, 172 Wn.2d at 453. "A prosecutor generally cannot comment on the defendant's failure to present evidence because the defendant has no duty to present evidence." Id.

## 1

Here, the State's voir dire questions about what type of evidence might be expected in a child molestation case did not impermissibly lower the burden of

proof. The State's questions were about jurors' willingness to accept evidence of a certain kind—witness testimony by the person molested—as opposed to evidence of other kinds, such as eyewitness, physical, or photographic evidence. The State never suggested that jurors could convict despite the lack of evidence.

In addition, the State's statements reflected the prospective juror's comments about what evidence they expected would be available. After discussing what physical evidence the jurors might expect to see, the State asked, "In the context of an adult perpetrator, a child victim, again, who would you say is kind of more responsible for the possibility of that the evidence being generated in that relationship." The State asked juror 1, "[I]f there are photographs that can be used as evidence against the molester, who chooses to create that evidence?" Right after hearing from juror 51, who discussed their understanding of the lack of physical evidence in sexual assault cases as gleaned from their daughter-in-law who is a certified sexual assault investigator, the State also stated,

> What I am essentially getting at here is I would like—I think we have essentially settled that these types of crimes won't very often, I suppose, leave physical evidence, things like DNA, as opposed to an implicitly physically violent offense that involves exchange of body fluids like—I will call it a, quote, classic rape. These types of crimes stand different.

Notwithstanding the State's use of the word "responsible," in context the State was asking about expectations for who would likely have more control over the existence of evidence, an adult perpetrator or a child victim. It was not improper to ask about such expectations.

11

2

Glass argues the State committed misconduct in closing argument by shifting the burden of proof through "urging the jury not to scrutinize any inconsistencies or lack of memory revealed by R.W.'s testimony" and using "moral language that suggested to the jury it should be condemned if it closely examined or questioned R.W.'s testimony." We disagree.

Prosecutors may not tell the jury there is a presumption the witness is telling the truth, but may argue the jurors should believe the witness's testimony and that if they do, the jurors should find the defendant guilty. See id. at 454. Here, the State argued in closing,

> Now, if these inconsistences [of forgetfulness] or these memory realities I will call them, occur in our daily lives, how dare we expect the victim of a sexual abuse to come and testify on a higher standard than that. How dare we. Just by the fact that she is saying that she was horrifically abused for over a year? No.

In context, the State was making a credibility argument that some inconsistencies in testimony did not mean R.W. was not credible. The prosecutor's reference to everyday experiences of the nature and limits of memory is different in kind from the argument we criticized in State v. Anderson, 153 Wn. App. 417, 425, 220 P.3d 1273 (2009), where the prosecutor argued that " 'beyond a reasonable doubt is a standard that you apply every single day,' " such as to decide to undergo elective surgery. We said this "trivialized and ultimately failed to convey the gravity of the State's burden." Anderson, 153 Wn. App. at 431. Here, the prosecutor never argued that beyond a reasonable doubt referred to a trivial or commonplace standard. Rather, the prosecutor argued that the everyday experience of memory

shows that testimony may be accepted as true even in the presence of inconsistencies or partial lack of memory. The State did not make an improper argument.

Because Glass did not object, Glass must show that a curative instruction would have been ineffective. An instruction on the burden of proof may "eliminate[] any possible confusion and cure[] any potential prejudice stemming from the prosecutor's improper remarks." Emery, 174 Wn.2d at 764. Here, the court instructed the jury that "[t]he State is the plaintiff and has the burden of proving each element of each crime beyond a reasonable doubt." Even if the prosecutor's statements were improper, Glass does not show any lingering confusion resulting in prejudice or that any such prejudice was incurable.

B

Glass argues that throughout trial, the State relied on an impermissible theme wherein the jury would convict Glass based upon R.W.'s mother's abandoning R.W., which appealed to the jury's emotions. We disagree.

An opening statement " 'should be confined to a brief statement of the issues of the case, an outline of the anticipated material evidence, and reasonable inferences to be drawn therefrom.' " Loughbom, 196 Wn.2d at 76 (quoting State v. Campbell, 103 Wn.2d 1, 15-16, 691 P.2d 929 (1984)). In both opening statements and closing arguments, prosecutors may not make arguments that require the jury to decide a case on an emotional basis, a threatened impact on other cases, or a threatened impact on society, among other things. See State v.

Thierry, 190 Wn. App. 680, 691, 360 P.3d 940 (2015) (hyperbole in rebuttal invited the jury to decide the case on emotional basis). Examples of improper appeal to the jury's emotions include arguments that ask the jury to decide questions about the societal problems of drug dealing or child sexual abuse. Thierry, 190 Wn. App. at 690-91; see, e.g., Loughbom, 196 Wn.2d at 77 ("[R]eferences to the war on drugs at the beginning of the prosecutor's opening statement, closing argument, *and* rebuttal argument cannot be said to be within the bounds of appropriate argument."); State v. Bautista-Caldera, 56 Wn. App. 186, 195, 783 P.2d 116 (1989) ("This plea is not based solely on the evidence, however, but in effect exhorts the jury to send a message to *society* about the general problem of child sexual abuse."). However, prosecutors have "wide latitude in drawing and expressing reasonable inferences from the evidence, including inferences about credibility." State v. Thompson, 169 Wn. App. 436, 496, 290 P.3d 996 (2012).

Here, the State's statements did not invite the jury to make a determination on evidence not presented or on unreasonable inferences. In opening remarks, the State began with laying out how R.W.'s mother disbelieved her and moved the family out, leaving R.W. behind, after R.W. disclosed the abuse. These statements reflect the State's elicited testimony from R.W. that J.P. called her a liar after the first time R.W. reported Glass's actions and then moved the family, excluding R.W., out of the home the second time R.W. reported his actions. It was not unreasonable to infer from evidence at trial that Glass felt emboldened to return to abusing R.W. after R.W. reported it to her mother and her mother disbelieved her.

J.P. testified she did not believe R.W. and thought R.W. was fabricating the abuse to get out of household chores. The State's statements were not improper.

The State's arguments about R.W.'s disclosures to J.P. and J.P.'s response were proper credibility arguments in the context of this case. They focused on the reasons why R.W.'s testimony about abuse by Glass and her reporting at different times were coherent. This argument was consistent with the jury's role in assessing credibility as instructed by the court based on, among other things, "the reasonableness of the witness's statements in the context of all of the other evidence." J.P.'s response to R.W.'s disclosures explained both why R.W. denied that abuse occurred at one time, why she reported at another time, why the abuse changed in character over time, and why the jury should not accept J.P.'s testimony at trial that she believed R.W. had wished to avoid having to do chores.

The State's statements also did not invite the jury to make a decision on emotion. A prosecutor's statements may be improper when using "vivid and highly inflammatory language." See e.g. State v. Claflin, 38 Wn. App. 847, 850 & n.3, 690 P.2d 1186 (1984) (remarks "vivid and highly inflammatory" when the prosecutor during closing argument read a poem to describe in detail an anonymous rape victim's experience). The State's metaphorical argument about R.W. having had "a bucket of chum" thrown on her and being thrown into "shark-infested waters" carried the potential risk of being so vivid that it suggested an emotional, rather than rational, decision. But in this case, in addition to Glass not

15

objecting, there was not repetitive use of overly charged language sufficient to invite the jury to decide the case on an improper basis.

Glass argues the State's closing rebuttal remarks encouraged the jury to decide the case based upon whether future victims would be believed. Glass points to Thierry and State v. Smiley, 195 Wn. App. 185, 191-95, 379 P.3d 149 (2016). In Thierry, the improper statement was:

> "Now I want to talk just briefly about the standard of beyond a reasonable doubt. You don't need to know all of the pieces. You don't need to have all of the information or have all the answers. If that were necessary, first of all, the standard would be beyond all doubt possible, but *if that were necessary, once again, the State would not be able to prosecute any of these crimes* or really any crime, actually, because how can you all as jurors who are selected from the community [and] know nothing about any of the people involved, and certainly yourselves were not present for any act or crime that was committed, how can you know with 100 percent certainty?"

190 Wn. App. at 685-86 (alteration in original). In Smiley, the prosecutor argued to the jury that if they did not believe the child's testimony, in cases where there is no eyewitness or corroborating evidence of child sex abuse, "kids would have to be told, we're sorry, we can't prosecute your case, we can't hold your abuser responsible because all we have is your word and that is not enough." 195 Wn. App. at 191.

The State's rebuttal argument here did not rise to the same level of asking the jury to decide this case based on what a verdict would say to future victims. The State argued that it is common for people to be forgetful but that inconsistencies do not mean a person is lying. In context, the statements reflect a credibility argument to the effect that some inconsistencies did not necessarily

mean R.W. was not credible. It did not suggest that the jury would be telling future child sexual assault victims they would not be believed like in <u>Thierry</u> or <u>Smiley</u>.

Glass did not object and the jury was read the proper instruction, and Glass does not show any potential prejudice was incurable.

C

Glass argues the State impermissibly elicited identification testimony in violation of an order in limine limiting fact of the complaint evidence.

Generally, a party is barred from raising issues on appeal it did not object to at trial. RAP 2.5(a). Evidentiary rulings made pursuant to a motion in limine may be reviewable despite no objection if there was a final ruling on the motion. <u>State v. Powell</u>, 126 Wn.2d 244, 256, 893 P.2d 615 (1995). "Because the purpose of a motion in limine is to avoid the requirement that counsel object to contested evidence when it is offered during trial, the losing party is deemed to have a standing objection where a judge has made a final ruling on the motion," unless the court indicates during its ruling a party is required to make further objections at trial. <u>Id.</u>

Otherwise, the prevailing party on a motion in limine to exclude evidence "should object to the admission of the allegedly inadmissible evidence in order to preserve the issue for review unless an unusual circumstance exists 'that makes it impossible to avoid the prejudicial impact of evidence that had previously been ruled inadmissible.' " <u>State v. Weber</u>, 159 Wn.2d 252, 272, 149 P.3d 646 (2006) (quoting <u>State v. Sullivan</u>, 69 Wn. App. 167, 173, 847 P.2d 953 (1993)). "Examples

of such unusual circumstances are when the other party's questions were 'in deliberate disregard of the trial court's ruling,' or 'an objection by itself would be so damaging as to be immune from any admonition or curative instruction by the trial court.' " Id. (quoting Sullivan, 69 Wn. App. at 173). In Weber, the court explained that without an objection, the trial court does not have "an opportunity to determine whether the evidence would even have been covered by the pretrial motions, or if it was covered by the motions, whether the court could have cured any potential prejudice through an instruction." Id. It also noted "there is a great potential for abuse when a party does not object because '[a] party so situated could simply lie back, not allowing the trial court to avoid the potential prejudice, gamble on the verdict, and then seek a new trial on appeal.' " Id. at 272-73 (alteration in original) (quoting Sullivan, 69 Wn. App. at 172).

Glass argues the State violated an order limiting fact of complaint evidence by questioning J.S. and R.W. to elicit Glass's identity. We conclude Glass does not show the State deliberately disregarded the ruling in limine or prejudice that would have resulted from an objection itself.

The fact of the complaint doctrine, although inconsistent with the rules of hearsay, is an exception to hearsay. See State v. Martinez, 196 Wn.2d 605, 613, 476 P.3d 189 (2020). The doctrine allows the State to present "evidence that the victim reported the sexual violence to someone as part of its case in chief." Id. at 611. "Testimony under the doctrine is not admissible for the truth of the matter asserted, only to demonstrate that the victim reported to someone. . . . Witnesses

may give sufficient details 'to identify the nature of the offense of which complaint was made,' but details such as identity of the perpetrator are not admissible." Id. (internal citation omitted) (quoting State v. Goebel, 40 Wn.2d 18, 25, 240 P.2d 251 (1952), overruled on other grounds by State v. Lough, 125 Wn.2d 847, 889 P.2d 487 (1995)).

The State's questioning does not reflect a deliberate disregard of the order in limine. J.S. testified she took R.W. out to lunch in 2018 because J.P. asked her to. The State asked why, and J.S. testified, "Because [J.P.] had reached out to me and told me that [R.W.] kept saying that she was being touched. And I just felt that I needed to go talk to her myself and have that conversation." J.S. added, "I asked [R.W.] if she was being touched. She told me no. I told her: Are you sure? She said: Yes. And then I said: If this is happening, call me. You can tell me. I don't care who is going to be mad." The State then asked J.S. about a conversation she had had with J.P.:

> Q. Now, as part of your, I guess, obligations as a school bus driver, are you a mandated reporter?
> A. I am.
> Q. What does it mean to be a mandated reporter?
> A. It means that if you hear something or see something, then you report it.
> Q. Report it to who?
> A. Authorities.
> Q. So was [J.P.] aware of this?
> A. She was.
> Q. How was [J.P.] aware of this?
> A. Because when I dropped her off in Tacoma, we were having a conversation on her back porch. And I told her that if [R.W.] said anything to me about what was going on, I was taking her to report it.
> Q. And how did [J.P.] react to hearing this?

19

> A. She shrugged her shoulder and said: Well, it will be off my shoulders.

In discussing R.W.'s disclosure, the State asked,

> Q. Now, did you and [R.W.] have a conversation that night?
> A. We did.
> Q. And did [R.W.] disclose to you that she had been being molested?
> A. She did.
> Q. Now, what did you do with that information?
> A. First I called [J.P.].
> Q. Did you contact the authorities at some point?
> A. I did. The next day we went to the Marysville Police Department and reported it.

In asking R.W. about the first time she disclosed to J.P. what had happened, the State asked,

> Q. So, did you eventually tell somebody that this was happening to you?
> A. Yes.
> Q. Who did you tell?
> A. My mom.
> Q. Let's talk about that conversation. Did you tell her that you were being molested?
> A. Yes.
> Q. How did she react?
> A. She called me a liar.
> Q. Did she do that immediately or after some questioning?
> A. After some questioning.
> Q. Now, did you have a conversation in the presence of the defendant about your disclosure? Did she ever bring you to talk to [Glass] about the disclosure?
> A. Yes.
> Q. Tell me about that. Tell me what happened.
> A. We went upstairs, and we sat in a circle. And I was crying. And my mom said: [R.W.] wants to talk to you. And I didn't want to. And so she said it. And then he said he wasn't doing it. So I left the room.
> Q. Did your mother make it clear that she did not believe you while you were in the room with the defendant?
> A. Yes.
> Q. How?
> A. Because she said I wanted to touch him.

20

Asking about the second disclosure, the State asked R.W.,

Q. Now what happened once you told your cousin what was going on?
A. She took me to my mom and her mom. And then my mom—she had told my mom. And then my mom went out there to [Glass] in the living room and said that she's saying you are doing it again. And then he left.
Q. What do you mean he left? Who is the "he" here?
A. [Glass].

In discussing R.W. reporting to the police, the State asked,

Q. And did you disclose to [the detective] that you had been being molested by the defendant?
A. Yes.

This final question included identification of the defendant as part of the question, but Glass did not object and R.W. otherwise clearly and repeatedly stated in her testimony that Glass had molested her. Otherwise, the State did not ask any questions about R.W.'s reporting that clearly suggested an intent to elicit either Glass's identity as the alleged abuser or details of R.W.'s allegations in violation of the order in limine, nor did the answers do so.

Glass argues R.W.'s testimony indirectly introduced details of the allegations, similar to State v. Alexander, 64 Wn. App. 147, 153, 822 P.2d 1250 (1992). In Alexander, this court determined the trial court erred in allowing the State to elicit the identity of the alleged perpetrator from a counselor under the fact of the complaint doctrine where the counselor kept describing the location of the incident and discussed filing a Child Protective Services claim. Id. Unlike Alexander, where the defendant objected twice to the counselor's testimony, Glass did not object to the testimony he now challenges on appeal. He thus gave the

trial court no opportunity to determine whether R.W.'s testimony violated the ruling in limine. Glass waived this issue by failing to object at trial and failing to show on appeal that an objection itself would result in incurable prejudice.

D

Glass argues the State persistently engaged in the above misconduct that collectively was prejudicial. However, the State did not improperly shift the burden of proof, the State made proper credibility arguments in closing, the State's theme did not impermissibly appeal to emotion, and the State did not deliberately disregard an order in limine such that we may review an evidentiary challenge that Glass waived. Therefore, there was not collective prejudice nor cumulative error requiring reversal.

III

Glass challenges several of his community custody conditions, arguing that their facial invalidity supports review for the first time on appeal.

We review de novo whether the trial court lacks statutory authority under the Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW, to impose a particular community custody condition. See State v. Armendariz, 160 Wn.2d 106, 110, 156 P.3d 201 (2007). Otherwise, "[t]he imposition of crime-related prohibitions is generally reviewed for abuse of discretion." Id. "A court abuses its discretion if a condition is either unconstitutional or manifestly unreasonable." State v. Lee, 12 Wn. App. 2d 378, 401, 460 P.3d 701 (2020). We review the

constitutionality of a community custody condition de novo. State v. Wallmuller, 194 Wn.2d 234, 238, 449 P.3d 619 (2019).

Generally, this court does not consider an issue raised for the first time on appeal. RAP 2.5(a). "[F]or an objection to a community custody condition to be entitled to review for the first time on appeal, (1) it must be manifest constitutional error or a sentencing condition that . . . is 'illegal or erroneous' as a matter of law, and (2) it must be ripe." State v. Peters, 10 Wn. App. 2d 574, 583, 455 P.3d 141 (2019) (quoting State v. Blazina, 182 Wn.2d 827, 833, 344 P.3d 680 (2015)). "If it is ineligible for review for one reason, we need not consider the other." Id. "The defendant must identify a constitutional error and show how, in the context of the trial, the alleged error actually affected the defendant's rights; it is this showing of actual prejudice that makes the error 'manifest' " State v. McFarland, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995).

A

Glass argues condition 16 infringes upon his right to familial association under the First Amendment of the United States Constitution. Condition 16 states, "Do not remain overnight in a residence where minor children live or are spending the night." We conclude the trial court erred in not conducting an on-the-record analysis balancing the State's essential needs and Glass's fundamental right to parent.

The First Amendment of the United States Constitution and article I, section 5 of the Washington State Constitution grant individuals a right to freedom of

association. In addition, "[t]he rights to marriage and to the care, custody, and companionship of one's children are fundamental constitutional rights, and state interference with those rights is subject to strict scrutiny." State v. Warren, 165 Wn.2d 17, 34, 195 P.3d 940 (2008). " '[A]n offender's usual constitutional rights during community placement are subject to SRA-authorized infringements.' " Lee, 12 Wn. App. 2d at 402 (quoting State v. Hearn, 131 Wn. App. 601, 607, 128 P.3d 139 (2006)). "[A] condition infringing on the right to parent one's child can only be upheld if the condition is reasonably necessary to accomplish the essential needs of the State and public order." State v. Reedy, 26 Wn. App. 2d 379, 394, 527 P.3d 156 (2023).

Here, the trial court did not conduct an on-the-record analysis of whether condition 16 was reasonably necessary to accomplish the State's essential needs or were imposed sensitively to the constitutional rights at stake. See id. at 394-95. Specifically, the sentencing court did not acknowledge Glass's fundamental right to parent or address whether the condition was reasonably necessary to prevent harm to his children or any future children. See State v. Torres, 198 Wn. App. 685, 690, 393 P.3d 894 (2017); Peters, 10 Wn. App. 2d at 584.

"[T]he imposition of crime-related prohibitions is necessarily fact-specific and based upon the sentencing judge's in-person appraisal of the trial and the offender." Rainey, 168 Wn.2d at 374-75. In imposing the conditions, the trial court did not address Glass's fundamental right to parent. Nor did the court explain, on

the record, whether condition 16 was reasonably necessary to achieve the State's compelling interest in preventing harm.

B

Glass contends condition 15 impairs his right to intimate human relationships. We disagree. Condition 15 states, "Do not date individuals who have minor children, as directed by the supervising Community Corrections Officer. Disclose sex offender status prior to any sexual contact. Sexual contact in a relationship is prohibited until the treatment provider/Community Corrections Officer approves of such."

The right to intimate association arises from the Fourteenth Amendment of the United States Constitution and protects "intimate human relationships." City of Bremerton v. Widell, 146 Wn.2d 561, 575-76, 51 P.3d 733 (2002) (citing Roberts v. U.S. Jaycees, 468 U.S. 609, 617-18, 104 S. Ct. 3244, 82 L. Ed. 2d 462 (1984)). Intimate human relationships are those " 'that attend the creation and sustenance of a family.' " Id. at 576 (quoting Roberts, 468 U.S. at 619).

A sentencing court may order a defendant to comply with any crime-related prohibition. RCW 9.94A.703(3)(f). A "[c]rime-related prohibition" is "an order of a court prohibiting conduct that directly relates to the circumstances of the crime for which the offender has been convicted." RCW 9.94A.030(10). The condition need not be causally related to the crime. State v. Zimmer, 146 Wn. App. 405, 413, 190 P.3d 121 (2008). SRA-authorized conditions, such as crime-related prohibitions,

may infringe upon an offender's usual constitutional rights during community custody. Lee, 12 Wn. App. 2d at 402.

Here, the jury convicted Glass of four counts of child molestation in the second degree for sexually assaulting his then-girlfriend's daughter who was 12. The SRA allows the court to order an offender to "refrain from direct or indirect contact with the victim of the crime or a specified class of individuals." RCW 9.94A.703(3)(b). The condition prohibits Glass from dating women with minor children, which the record shows is reasonably related to his offense and meets the State's interest in protecting children.

C

Glass argues condition 8 is unconstitutionally vague because it leaves unlimited discretion to deny him housing or employment. He argues condition 13 is unconstitutionally vague because it fails to adequately describe what employment is prohibited. The State argues Glass's challenge is unripe because further factual development is needed when the Department of Corrections (DOC) has yet to deny him.

Condition 8 provides, "Receive prior approval from your supervising Community Corrections officer for your residence location, living arrangements, and employment. Immediately notify your supervising Community Corrections Officer of any change in your residence location, living arrangements, or employment." Condition 13 states, "Do not seek employment or volunteer

26

positions which place you in contact with, control over, or hold any position of authority or trust involving minor children."

Contrary to the State's argument, Glass's challenge is ripe because it "involves a legal question that can be resolved on the existing record." State v. Padilla, 190 Wn.2d 672, 677, 416 P.3d 712 (2018). But we disagree the conditions are unconstitutionally vague.

"Under the Fourteenth Amendment to the United States Constitution and article 1, section 3 of the Washington State Constitution, citizens must have fair warning of proscribed conduct." State v. Lundstrom, 34 Wn. App. 2d 977, 979, 572 P.3d 1243 (2025). "A community custody condition is unconstitutionally vague if '(1) it does not sufficiently define the proscribed conduct so an ordinary person can understand the prohibition or (2) it does not provide sufficiently ascertainable standards to protect against arbitrary enforcement.' " Id. (quoting Padilla, 190 Wn.2d at 677). "[A] condition 'is not unconstitutionally vague merely because a person cannot predict with complete certainty the exact point at which his actions would be classified as prohibited conduct.' " Id. at 979-80 (internal quotation marks omitted) (quoting Padilla, 190 Wn.2d at 677).

In Lundstrom, this court held the condition for the defendant to remain within a geographic boundary set by the DOC was not vague because the legislature mandated the sentencing court order the condition and a person of ordinary intelligence could understand the condition required the defendant to remain in a geographic area set by the DOC. Id. at 980. The legislature required the DOC's

condition, which must be reasonably related to the crime, risk of reoffending, or community safety, to be subject to administrative review, and the condition must give ordinary people sufficient notice to understand the conduct proscribed. Id. at 981, 982-83.

Glass has not shown how a person with ordinary intelligence would be unable to understand "in contact with, control over, or hold any position of authority or trust involving minor children" as written in condition 13. "In determining whether a challenged condition is 'sufficiently definite so as to provide fair warning of proscribed conduct,' we do not consider its language in a vacuum, but in the context in which it is used." Id. at 980 (quoting City of Spokane v. Douglass, 115 Wn.2d 171, 180, 795 P.2d 693 (1990)). "If persons of ordinary intelligence can understand what the law proscribes, apart from some possible areas of disagreement, the law is sufficiently definite." Id. The hypotheticals Glass proposes foreshadow potential disagreements over what "contact" might mean, but in context, the language of the condition—"control over, or hold any position of authority or trust"—remains understandable to a person of ordinary intelligence: do not work with children.

In addition, the legislature has provided statutory authority to the trial court and the DOC to require an offender to "[n]otify the community corrections officer of any change in the offender's address or employment" as well as living arrangements as provided in condition 8. RCW 9.94A.704(3)(c); RCW 9.94A.703(2)(b), (d). The statute does not confer unlimited discretion in denying

28

Glass employment or housing because an administrative review of the conditions is afforded to ensure they are reasonably related to the crime of conviction, the offender's risk of reoffending, or the safety of the community. RCW 9.94A.704(7)(b),(c) (discussing review board's authority to impose or modify conditions and outlining criteria permitting a community custody condition to remain in effect on administrative review). These conditions are not vague because of unascertainable standards or unlimited discretion.

D

Glass argues ripeness is a prudential bar to review, not a jurisdictional bar, and therefore we should reverse the imposition of condition 10 to include a reasonable suspicion requirement if we reverse and remand other conditions. Condition 10 provides, "You must consent to DOC home visits to monitor your compliance with supervision. Home visits include access for purposes of visual inspection of all areas of the residence in which you live or have exclusive or joint control and/or access." We decline to reach his challenge because it is not ripe.

A preenforcement challenge to a community custody condition is ripe for review if " 'the issues raised are primarily legal, do not require further factual development, and the challenged action is final.' " State v. Cates, 183 Wn.2d 531, 534, 354 P.3d 832 (2015) (internal quotation marks omitted) (quoting State v. Sanchez Valencia, 169 Wn.2d 782, 786, 239 P.3d 1059 (2010)). In addition, "we must consider the hardship to the [defendant] if we refused to review [the] challenge on direct appeal." Sanchez Valencia, 169 Wn.2d at 789.

29

It is undisputed that Glass's judgment and sentence is final and that this issue relating to condition 10 is purely legal. But, Glass does not show any significant risk of hardship at this time were we to decline to review the challenge. See Cates, 183 Wn.2d at 536 (concluding Cates failed to show hardship when "compliance here does not require Cates to do, or refrain from doing, anything upon his release until the State requests and conducts a home visit.").

IV

We reverse and remand on the issue of the court's failure to conduct an on-the-record analysis balancing the State's essential needs and Glass's fundamental right to parent in relation to condition 16. Otherwise, we affirm.

_Birk, J._

WE CONCUR:

_Chung, J._          _Diaz, J._

30